**WO**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA



| | |
|---|---|
| In re:<br>KRYSTAL ENERGY CO., INC.,<br>Debtor. | No. CV 08-178-PHX-MHM<br>Bk. No. 01-166-GBN<br>Adv. No. 01-171<br>**ORDER** |
| THE NAVAJO NATION, a domestic sovereign nation,<br>Appellant,<br>vs.<br>KRYSTAL ENERGY CO., INC.,<br>Appellee. | |

Currently pending before the Court is Appellant Navajo Nation's ("Navajo Nation") Interlocutory Appeal from a January 15, 2008 Order entered by the Honorable George B. Nielsen, Jr. , Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, granting Appellee Krystal Energy Company's ("Krystal") Partial Motion for Summary Judgment. (Dkt. #16). Judge Nielsen ordered the Navajo Nation to turn over property located on well sites and provide an accounting for any property taken from those sites. The Court possesses jurisdiction over this matter under 28 U.S.C. § 158(a). After reviewing the pleadings and the record excerpts submitted for purposes of this interlocutory appeal, and having determined that oral argument is unnecessary, the Court issues the following order.

## I. BACKGROUND

In May 1997, Krystal Energy, Inc. allegedly entered into an "Assignment of Oil and Gas Lease Operating Right" concerning oil wells located near Gallup, New Mexico (the "New Mexico Assignment") and a similar Assignment located near Aneth, Utah (the "Utah Assignment"). (Appellant's App. No. 6; Krystal's Compl. ¶¶ 8-9; Appellee's App. No. 2, pp. 14-15, ¶¶ 2-3). Both lease assignments concern oil wells located on lands within the Navajo Nation. (Appellee's App. No. 2, p.15, ¶5). Krystal alleges that the Navajo Nation and Bureau of Indian Affairs initially approved the proposed assignments at a May or June 1997 meeting in Farmington, New Mexico. (Id., ¶6). Following that meeting, the occurrence of which appears undisputed by the Navajo Nation, and allegedly with the full knowledge, consent, and approval of both the Navajo Nation and the United States Department of the Interior, Krystal went into possession of both the Utah and New Mexico Assignments, made substantial investments in the well sites and equipment, and began operations. (Appellee's App. No. 2, p.16, ¶¶ 9-10).

On May 29, 1998, the Bureau of Land Management ("BLM") of the U.S. Department of the Interior advised the Navajo Nation Minerals Department that it had no objection to the assignment of the Utah Oil lease. (Id., ¶7). On August 10, 1998, the Navajo Nation Minerals Department received a formal application from Bruce Nicholson on behalf of Krystal Energy, Inc. for the Utah Assignment. (Dkt. #16, p.1; Appellant's App. No. 4). However, on July 26, 1999, the BLM sent a letter to the assignor of the leases, Amoco Production Co., stating that "[t]he Navajo Nation has declined to approve Krystal Energy's assignments from Amoco Production Co. for the subject lease due to a disagreement between the two entities." (Appellant's App. No. 4, p.101). The letter also stated that Amoco Production Co. ("Amoco") was required to plug and abandon the wells, as the BLM had first directed on May 6, 1997 (the procedures for which had been approved on April 28, 1998), prior to the proposed assignments to Krystal, which allegedly also took place in May 1997. (Id., pp. 99, 101). Subsequently, on December 8, 1999, the Bureau of Indian Affairs informed Krystal that it would not process the proposed assignments "because Krystal Energy is currently not

eligible to obtain a lease under the Navajo Nation law and due to other concerns of the Navajo Nation." (Id., p.103). In that same letter, the Bureau directed Krystal "to immediately cease all operation" on the well sites, and instructed "the current lessee, Amoco Production Company, . . . to immediately take over operation of the subject lease." (Id.).

On December 20, 1999, Navajo Nation officials arrived at the Utah well site and forcibly evicted Hubert Dayzie, a Krystal employee, from the site. (Appellee's App. No. 2, p.26, ¶7). The Navajo Nation officials loaded generators and other equipment that belonged to Krystal for transport from the site; storage tanks containing crude oil were emptied and loaded into trailers. (Id.). The Navajo Nation officials then chained and padlocked the gate surrounding the well site, and informed Mr. Dayzie that he could not re-enter the site; the New Mexico well site was also chained and padlocked. (Id.). Approximately two months later, Mr. Dayzie returned to the Utah well site and saw that "much additional Krystal personal property had been removed from the site." (Id., ¶10). On March 28, 2000, John Dietz, an attorney representing Krystal, wrote to Amoco advising them that Krystal was asserting claims against the Navajo Nation for the acts described above. (Appellee's App. No.4, pp. 59-60).

Due to the unresolved issues, Amoco waited until September 2000 to being its process of plugging and abandoning the well sites (Appellant's App. No.4, p.105). The "P[lug] & A[bandon] Operation Cement Service Report[s]" indicate that Amoco continued the plug and abandon process through November 2000. (Id., pp. 105-07, 113-24). Those reports make no mention of Krystal's property. (Id.). In March 2001, Akhtar Zaman, Director of the Navajo Nation Minerals Department, apparently wrote a memorandum to Amy Alderman, a tax attorney for the Navajo Tax Commission, and stated that "[t]here are no equipments, including pump jacks, storage vessels, or flow line system, left on the lease. According to an employee of the servicing company which was contracted by Amoco to plug the wells, all flow lines were given to the servicing company by Amoco. Pump jacks or storage vessels were apparently taken by Amoco." (Dkt. #16, Appellant's App. No. 4, pp. 87-90). The

value of the equipment that Krystal had at the well sites has been appraised at a "forced liquidation value" of $1,075,000.00. (Dkt. #17, p.12).

On January 5, 2001, Krystal filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Arizona. (Dkt. #7, p.2; Dkt. #13, p.2). On March 5, 2001, Krystal filed an adversary proceeding against the Navajo Nation, seeking (1) a turnover of assets under 11 U.S.C. § 542(a); (2) a determination of tax due to the Navajo Nation under 11 U.S.C. § 505; and (3) damages arising out of the seizure of Krystal's assets by the Navajo Nation. (Id.). The Navajo Nation filed a motion to dismiss the adversary complaint; the Bankruptcy Court granted the motion on September 28, 2001, and this Court subsequently upheld that ruling on September 30, 2002. (Dkt. #11, 2:01-cv-1970-MHM). Krystal appealed the Court's order to the Ninth Circuit, during which time the bankruptcy administrative case was dismissed. (Dkt. #7, p.2; Dkt. #13, p.2). However, the "Stipulated Order Dismissing Case Effective February 14, 2003 and Reserving Jurisdiction over Adversary Proceeding" reserved exclusive jurisdiction over the adversary proceeding in order to allow appeal to the Ninth Circuit. (Dkt. #7, p.2).

The Ninth Circuit reversed this Court's September 30, 2002 order and held that Congress had abrogated the sovereign immunity of Indian tribes under 11 U.S.C. § 106(a). (Id.); Krystal Energy Co. v. Navajo Nation, 257 F.3d 1055 (9th Cir. 2004) (holding that Congress has abrogated Indian tribes' sovereign immunity for purposes of bankruptcy matters under 11 U.S.C. § 106(a)). As a result, on August 2, 2004, this Court reversed the Bankruptcy Court's September 28, 2001 Order dismissing Krystal's adversary complaint against the Navajo Nation and remanded the case to the Bankruptcy Court for further proceedings. (Dkt. #15, Case No. 2:01-cv-1971-PHX-MHM).

Krystal filed an amended complaint in the Bankruptcy Court on July 25, 2006 (Dkt. #13, p.2), and a second amended complaint on December 7, 2006 (Dkt. #7, p.3). The second amended complaint added five new counts: (1) breach of contract; (2) unjust enrichment / estoppel; (3) violation of due process; (4) violation of automatic stay; and (5) injunctive relief. (Dkt. #7, p.3; Dkt. #13, pp.2-3). On March 5, 2007, the Navajo Nation filed a motion

to dismiss, which the Bankruptcy Court granted in part on May 23, 2007, dismissing Krystal's claims of breach of contract, unjust enrichment / estoppel, and violation of due process. (Id.). Then, on January 15, 2008, the Bankruptcy Court granted Krystal's motion for partial summary judgment on Krystal's claim for a turnover of assets under 11 U.S.C. § 542, ordering the Navajo Nation to turn over all of Krystal's property and provide an accounting for the property taken. (Dkt. #16, Appellant's App. No. 1). In addition, the Bankruptcy Court ordered that "[Krystal] is entitled to judgment against [the Navajo Nation] for the value of the property removed from the well sites, and judgment will be entered accordingly." (Id., p.3). Three counts remain pending before the Bankruptcy Court – (1) violation of automatic stay under 11 U.S.C. § 362(a); (2) tax determination under 11 U.S.C. § 505; and (3) injunctive relief. On January 15, 2008, the Navajo Nation filed a motion for leave to bring an interlocutory appeal under 28 U.S.C. § 158(a); the Court granted the motion on June 18, 2008. (Dkt. #2).

## II. ISSUES

This is an interlocutory appeal under 28 U.S.C. § 158(a). The Navajo Nation appeals the Bankruptcy Court January 15, 2008 Order granting Krystal's motion for partial summary judgment on Krystal's claim for turnover of property under 11 U.S.C. § 542(a). The Bankruptcy Court ordered the Navajo Nation to turn over all of Krystal's property and account for any property that was taken from the two well sites at issue in this case. (Appellant's App. No. 1). The Bankruptcy Court further ordered that Krystal is entitled to judgment against the Navajo Nation for the value of the property that was removed from the well sites. (Id.).

The Navajo Nation presents two issues on appeal: (1) whether the Bankruptcy Court erroneously determined that Krystal's property was in the possession, custody or control of the Navajo Nation under 11 U.S.C. § 542(a); (2) whether the Bankruptcy Court erroneously determined that Krystal possessed a legal or equitable interest in the property to be turned over and accounted for. (Dkt. #16, p.3).

## III. STANDARD OF REVIEW

A district court may hear appeals from "final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges." 28 U.S.C. § 158(a). A bankruptcy court's findings of fact are reviewed under the "clearly erroneous" standard, and its conclusions of law are reviewed *de novo*. In re Compton Impressions, Ltd., 217 F.3d 1256, 1260 (9th Cir. 2000); Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). "[R]eview under the 'clearly erroneous standard' is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" Granite State Ins. Co. v. Smart Modular Technologies, Inc., 76 F.3d 1023, 1028 (9th Cir. 1996) (quoting Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 623 (1993)).

"On appeal, a district court may affirm, modify, or reverse a bankruptcy judge's judgment, Order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. A district court, acting as the appellate court for purposes of appeals from the bankruptcy court, "may affirm the lower court on any ground fairly supported by the record." In re Leavitt, 171 F.3d 1219, 1223 (9th Cir. 1999). In general, a party appealing from a bankruptcy court order may not raise issues that were not raised at the trial level. In re Marvin Properties, Inc., 76 B.R. 150, 153 (9th Cir. 1987). Nevertheless, a district court has the authority to consider any issue presented by the record, even if not addressed by the bankruptcy court. Matter of Pizza of Hawaii, Inc., 761 F.2d 1374, 1379 (9th Cir. 1985).

## IV. ANALYSIS

Section 542(a) of the Bankruptcy Code enables a debtor to recover property that belongs to the estate. 11 U.S.C. § 542(a). Specifically, section 542(a) provides:

> [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such

> property, unless such property is of inconsequential value or benefit to the estate.

See In re Del Mission Ltd., 98 F.3d 1147, 1151 (9th Cir. 1996) ("11 U.S.C. § 542(a) provides that an entity in possession of estate property "shall" deliver such property to the trustee. This is a mandatory duty arising upon the filing of the bankruptcy petition."). "[A] creditor's knowing retention of property of the estate constitutes a violation" of 11 U.S.C. § 362(a)(3). In re Abrams, 127 B.R. 239, 242 (9th Cir. 1991) (creditor's continued retention of repossessed vehicle after receiving notice of bankruptcy violated automatic stay); accord Knaus v. Concordia Lumber Co., 889 F.2d 773, 775 (8th Cir. 1989) ("The failure to [turn over], regardless of whether the original seizure was lawful, constitutes a prohibited attempt to 'exercise control over the property of the estate' in violation of the automatic stay."). Section 362(a)(3) "proscribe[s] the mere knowing retention of estate property." Del Mission, 98 F.3d at 1151; see also In re Colortran, Inc., 210 B.R. 823, 826-27 (9th Cir. 1997) ("A creditor who fails to return the estate's property after it knows of the debtor's bankruptcy is subject to sanction for willful violation of the automatic stay."), aff'd in part and vacated in part on other grounds, 165 F.3d 35 (9th Cir. 1998)

**A. Federal Regulatory Scheme**

The Navajo Nation contends that 11 U.S.C. § 542(a) can not be applied against the Navajo Nation because the "comprehensive federal regulatory scheme of oil and gas development and production in Indian Country" prevents a determination that Krystal's property is in the possession, custody or control of the Navajo Nation. (Dkt. #16, p.4). After thoroughly discussing the federal regulations and procedures covering oil and gas lease assignments in Indian Country, the Navajo Nation contends that "[t]he Bankruptcy Court's determination that the Navajo Nation took the property on the leases completely ignores the pervasive federal regulatory supervision of oil and gas production on the Navajo Nation." (Dkt. #16, p.5).

Sections 1 through 3 of the Indian Mineral Leasing Act of 1938 (the "Act"), 25 U.S.C. § 396(a) *et seq.*, establish procedures for leasing oil and gas interests on tribal lands. Section

4 provides that "[a]ll operations under any oil, gas, or other mineral lease issued pursuant to the [Act] shall be subject to the rules and regulations promulgated by the Secretary of the Interior." 25 U.S.C. § 396d. "Under this grant of authority, the Secretary has issued comprehensive regulations governing the operation of oil and gas leases." Kerr-McGee Corp. v. Navajo Tribe of Indians, 471 U.S. 195, 199 (1985) (citing 25 CFR pt. 211 (1984)). Regardless, the Federal Government remains "firmly committed to the goal of promoting tribal self-government." New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334-35 (1983); see e.g., Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.*, Kerr-McGee, 471 U.S. at 200 (tribes maintain dual roles as "commercial partners" and sovereigns – "The tribe acts as a commercial partner when it agrees to sell the right to the use of its land for mineral production, but the tribe acts as a sovereign when it imposes a tax on economic activities within its jurisdiction.").

"Only the Tribe has authority to lease its lands. The Secretary's authority extends only to approving or disapproving leases entered into by the Tribe." Wilson v. U.S. Dept. of Interior, 799 F.2d 591, 592 (9th Cir. 1986) (citing Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 372 (1968) (Secretary not lessor in oil and gas leases on Indian land and cannot grant leases on his own authority); 25 U.S.C. § 396a (1982) (an Indian tribe may lease its land with approval of the Secretary). A Tribe may obtain approval of the Secretary of the Interior for a lease pursuant to 25 U.S.C. § 415, authorizing commercial leases of Indian lands. Yavapai-Prescott Indian Tribe v. Watt, 707 F.2d 1072, 1073 (9th Cir. 1983) ("Congress adopted section 415 to encourage long-term commercial leases of Indian land and thereby to enhance its profitable development."). If a tribe will not enter into a lease, then the Secretary has no authority to approve the lease application. Wilson, 799 F.2d at 592 (citing Quantum Exploration, Inc. v. Clark, 780 F.2d 1457, 1459-60 (9th Cir. 1986) (nothing for the Secretary to approve if the Indian tribe has rescinded its agreement).

Although the record indicates that Krystal received initial approval for the Utah and New Mexico assignments from both the Navajo Nation and the Bureau of Land Management, the Navajo Nation later declined to approve the leases, and the BLM

accordingly informed Krystal that it was returning the proposed leases to Amoco, the original lessor. As such, the BLM directed Krystal to cease operations and instructed Amoco to take over operations of the lease. The Navajo Nation argues that this fact, i.e., the fact that Krystal never obtained final approval of the lease assignments, establishes that Krystal can not assert a valid claim against the Navajo Nation) for the return of Krystal's personal property under 11 U.S.C. § 542(a). However, the Court fails to see how the issues surrounding whether Krystal obtained valid leases under the applicable federal regulatory scheme have any bearing on whether the Navajo Nation may be held liable for the turnover of Krystal's property pursuant to 11 U.S.C. § 542(a). The validity or invalidity of the subject leases has no bearing on the nature of any of Krystal's personal property that is or had been located on the Utah and New Mexico well sites. Indeed, it does not even appear that the Navajo Nation argues as much; rather, the Navajo Nation appears to contend that the federal regulatory scheme, and the alleged failure of Krystal to satisfy all of the requisite leasing requirements, somehow absolves the Navajo Nation of any sort of liability for turnover of property under 11 U.S.C. § 542(a).

The Navajo Nation's arguments boil down to an assertion that the Navajo Nation should not be held liable for the loss or return of any of Krystal's property that had been located on the Utah and New Mexico well sites because it was the BLM that ordered Krystal to cease operations and then directed Amoco to take over operation of the lease and plug and abandon the well sites. However, the record indicates the BLM merely informed Krystal that it could not approve the leases because the Navajo Nation did not consent to them. As such, the BLM directed Amoco, the original lessor, to take over the operations of the well sites, and, pursuant to the BLM and Amoco's previous plans, plug and abandon the wells. The BLM's involvement here is limited, and it certainly does not shield the Navajo Nation from liability arising out its actions in connection with Krystal's property located on the well sites. Indeed, there is no indication in the record that the BLM ever exercised any control over the well sites or the property located on them.

The Navajo Nation also asserts that it can not be held liable for the return of Krystal's property because Amoco and the servicing company that it contracted with to plug the wells allegedly took equipment from the well sites when they plugged and abandoned the wells. (Dkt. #16, p.5). The support for that assertion comes from the affidavit of Amy Alderman, which states that in March 2001, Akhtar Zaman, Director of the Navajo Nation Minerals Department, told her that "[t]here are no equipments, including pump jacks, storage vessels, or flow line system, left on the lease. According to an employee of the servicing company which was contracted by Amoco to plug the wells, all flow lines were given to the servicing company by Amoco. Pump jacks or storage vessels were apparently taken by Amoco." (Dkt. #16, Appellant's App. No. 4, pp. 87-90). However, Amoco did not begin to plug and abandon the subject well sites until September 2000. In contrast, the uncontroverted facts, as set forth in the record through depositions by eye-witnesses, establish that in December 1999, Navajo Nation officials evicted Krystal employees from the well sites, took equipment that belonged to Krystal for transport from the site, and chained and locked the well sites, telling Krystal's employees that they could not return. (Appellee's App. No. 2, p.26, ¶7). Also uncontroverted is an eyewitness statement that approximately two months thereafter, "much additional Krystal personal property had been removed from the [Utah] site." (Id., ¶10). The Navajo Nation's only response to these declarations are bare assertions that its officials would not have been directed to take Krystal's property. (Dkt. #17, p.21). As the Bankruptcy Judge correctly noted, such assertions, without more, are insufficient to survive summary judgment. (Appellant's App. No. 2, pp. 16-17). In addition, the Bankruptcy Judge addressed the Navajo Nation's contention that Amoco may have taken some of Krystal's property after they plugged and abandoned the wells. See id., pp. 9-10. The Judge noted that the Navajo Nation was not arguing as a defense that it assigned to Amoco the responsibility for returning Krystal's equipment. Further, the Judge noted that the Navajo Nation did not seek to bring Amoco into the bankruptcy proceeding. Indeed, as the Judge remarked at the January 8, 2008 oral argument, "as long as it's proper you can eject someone from your property, but that doesn't mean you get to keep the property that that person has brought onto

the property. That's the explanation that seems to be lacking in the response." (Id., p.10). This Court continues to find that explanation lacking, and finds unpersuasive the Navajo Nation's arguments concerning the effect of the applicable federal regulatory scheme on the application of 11 U.S.C. § 542(a). The Bankruptcy Judge thoroughly addressed these issues at the January 8, 2008 oral argument; his findings of facts are not clearly erroneous, and after reviewing the applicable law, the Court finds no reason to question his conclusions of law.

**Accordingly,**

**IT IS HEREBY ORDERED** that the January 15, 2008 Order and Judgment of the Honorable George B. Nielsen, Jr. , Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, is AFFIRMED.

**IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment accordingly.

DATED this 26th day of September, 2008.

Mary H. Murguia
United States District Judge